U S WEST COMMUNICATIONS,
INC., Petitioner,

v.

PUBLIC SERVICE COMMISSION OF
UTAH; Stephen F. Mecham, Chairman;
James M. Byrne, Commissioner; and
Steve Hewlett, Commissioner, Respondents.

No. 930313.

Supreme Court of Utah.

July 13, 1995.

Floyd A. Jensen, Ted D. Smith, Salt Lake City, for petitioner.

Jan Graham, Atty. Gen., David L. Stott, Kent Walgren, Michael L. Ginsberg, Asst. Attys. Gen., Salt Lake City, for respondents and intervenors Committee of Consumer Services and Div. of Public Utilities.

ZIMMERMAN, Chief Justice:

U S West Communications, Inc. ("USWC"), seeks review of an order of the Public Service Commission ("the Commission") approving a $4,907,000 increase in USWC's rates. USWC asserts that the Commission erred in (i) disallowing an increase for 10% of USWC's expenses for services rendered by its affiliate U S West Communications Services, Inc.; (ii) disallowing an increase for 34% of USWC's rental payments to its affiliate U S West Real Estate, Inc.; (iii) disallowing an increase for the expense of USWC's long-term incentive compensation plan for executives; and (iv) refusing to rule on USWC's proposed accounting adjustment to nonexecutive incentive compensation expenses. USWC also challenges the Commission's treatment of pension credits and the cost of post-retirement benefits other than pensions. We affirm in part and reverse and remand in part.

Our review is governed by section 63–46b–16(4) of the Utah Administrative Procedures Act, Utah Code Ann. §§ 63–46b–0.5 to –22. In pertinent part, section 63–46b–16(4) provides as follows:

> (4) The appellate court shall grant relief only if, on the basis of the agency's record, it determines that a person seeking judicial review has been substantially prejudiced by any of the following:
>
> (a) the agency action ... is unconstitutional ...;
>
> ...;
>
> (c) the agency has not decided all of the issues requiring resolution;
>
> (d) the agency has erroneously interpreted or applied the law;
>
> ...;
>
> (g) the agency action is based upon a determination of fact, made or implied by the agency, that is not supported by substantial evidence when viewed in light of the whole record before the court;
>
> (h) the agency action is:
>
> ...;

(iv) otherwise arbitrary or capricious.

Utah Code Ann. § 63–46b–16(4).

We address the claims of USWC in order. USWC first contends that the Commission erred in disallowing a rate increase to cover 10% of USWC's expenses for marketing services rendered by its affiliate U S West Communications Services, Inc. ("USWCS"). USWC sought an increase to cover 100% of its expenses paid to USWCS. The Committee of Consumer Services ("the Committee"), a party to the proceeding before the Commission, proposed a disallowance of 10% of that amount on the basis that the services provided by USWCS "may be duplicative" of services provided by another USWC affiliate, U S West Advanced Technologies, Inc. ("USWAT"), or of services which USWC was itself capable of providing. The Commission adopted the Committee's proposed disallowance, concluding that USWC "has not met its burden to provide sufficient information to permit us to determine that [USWCS's] charges are reasonable for services necessary to the provision of utility services."

USWC now argues that (i) the Commission incorrectly placed the burden on USWC of proving that the services rendered by USWCS were not duplicative rather than requiring the Committee to produce evidence in support of its proposed disallowance; (ii) the Commission erred in concluding that USWC failed to meet its burden of proof by arbitrarily ignoring credible, uncontradicted evidence that the services rendered by USWCS were not duplicative; and (iii) because no evidence was presented as to the specific percentage of services rendered by USWCS which were duplicative, the Commission's disallowance of 10% of USWC's expenses was arbitrary. We conclude that although the Commission properly placed the burden of proof on USWC, the Commission erred in concluding that USWC failed to meet that burden.[1]

■ Although USWC acknowledges that it bears the burden of proving that the expenses it seeks to have reflected in a rate

---

1. Because we resolve USWC's claim of error on other grounds, we do not address USWC's argument that the Commission's disallowance of 10% of the expenses at issue, as opposed to some other percentage, was arbitrary.

increase are reasonable, *see Utah Dep't of Business Regulation v. Public Serv. Comm'n,* 614 P.2d 1242, 1245 (Utah 1980), it suggests that these expenses should be presumed reasonable and that the party opposing the rate increase should bear the burden of producing evidence to the contrary. We disagree. Whatever merit USWC's argument might have in the context of non-affiliate expenses, we do not think an affiliate expense should carry a presumption of reasonableness. While the pressures of a competitive market might allow us to assume, in the absence of a showing to the contrary, that nonaffiliate expenses are reasonable, the same cannot be said of affiliate expenses not incurred in an arm's length transaction. *See Boise Water Corp. v. Idaho Pub. Util. Comm'n,* 97 Idaho 832, 838, 555 P.2d 163, 169 (1976) ("The reason for this distinction between affiliate and non-affiliate expenditures appears to be that the probability of unwarranted expenditures corresponds to the probability of collusion."); *see also Arkansas–Louisiana Gas Co. v. City of Texarkana,* 17 F.Supp. 447, 459–60 (W.D.Ark.1936) (burden rests "heavily" on utility to show service provided by affiliate was of value to utility). Because USWCS was an affiliate of USWC, the Commission did not err in placing the burden on USWC of proving that the services rendered by USWCS were not duplicative.

■ Nonetheless, the Commission's unexplained disregard of credible, uncontradicted evidence that the services rendered by USWCS were not duplicative was arbitrary and capricious and therefore warrants reversal under Utah Code Ann. § 63–46b–16(4)(h)(iv). Joseph Dwyer, who was responsible for managing the contractual and other business arrangements between USWC and its affiliates, testified that there was no possibility of duplication in the services rendered by USWCS, USWAT, and USWC. The relevant portion of Dwyer's testimony reads as follows:

USWCS has responsibility for virtually all sales activity for the Large Business Unit of USWC. There is only a handful of sales personnel on the USWC payroll. Strategic Account Managers, Account Managers and Account Executives are all on the USWCS payroll and not the USWC payroll. This sales responsibility has been assigned to USWCS. As a result there is no possibility for duplication between USWCS and USWC.

. . . .

The services provided by [USWAT] are distinctly different from the market and product management activities performed at either USWCS or USWC.

[USWAT's] principle [sic] function is to perform and interpret market research studies conducted for various business units and market units of U S West, Inc. These studies assess what types of products/services are desired by customers, what customers are willing to pay, and customer satisfaction with current product/service offerings.

Marketing activities performed at USWC are directed towards identifying the needs of customers and developing business solutions to address those needs. The responsibilities include assessing customer needs by segment/industry/defined customer group, and developing programs which profitably deliver products addressing those needs.

Marketing functions performed at USWCS are focused on taking the market planning information developed by USWC and using this information to develop specific sales plans and objectives.

The important distinction is that USWC and USWCS marketing activities are targeted to meet the needs of specific customer groups, while [USWAT] (1) determines what broad categories of products and services are needed to meet customer needs in the future and (2) assessing how well current customer needs are being met. There is no overlap.

Dwyer's testimony was not challenged, either through cross-examination or by rebuttal witness. Yet, the Commission ignored this testimony without explanation. The Commission now argues that it discounted Dwyer's testimony because Dwyer was relying on a USWC value study which the Commission found unreliable and expressly refused to consider. However, the record re-

veals that Dwyer relied on the value study only to determine the percentage of USWCS's activities relating to marketing. Dwyer's testimony that the services rendered by USWCS were not duplicative was not based on the value study, but on his own personal knowledge. Therefore, we conclude that the Commission acted arbitrarily and capriciously in ignoring Dwyer's uncontradicted testimony and in concluding that USWC did not meet its burden of proving that the services provided by USWCS were not duplicative. *See Jones v. California Packing Corp.*, 121 Utah 612, 244 P.2d 640, 644 (1952) ("The law does not invest the Commission with any such arbitrary power to disbelieve or disregard uncontradicted, competent, credible evidence, as it appears to have done here."); *cf. De Vas v. Noble*, 13 Utah 2d 133, 369 P.2d 290, 293 (1962) (arbitrary and unreasoning distortions of justice could occur if courts were permitted to ignore credible and uncontradicted evidence), *cert. denied*, 371 U.S. 821, 83 S.Ct. 37, 9 L.Ed.2d 61 (1962). Accordingly, we reverse and remand to the Commission to reconsider the reasonableness of USWC's expenses for marketing services rendered by USWCS. Utah Code Ann. § 63–46b–16(4)(h)(iv).[2]

■ USWC next challenges the Commission's disallowance of 34% of USWC's rental payments to its affiliate U S West Real Estate, Inc. ("USWRE"). USWC sought an increase to cover 100% of its rental payments to USWRE. The Commission allowed only 66%, concluding that "the rental payment, as shown by a [USWC] exhibit, was 34 percent above average market rates for the area during the test period.... [A] disallowance equal to the amount the lease rate is above market is appropriate and should be adopted." USWC contends that the Commission's finding that only 66% of the USWRE expense was reasonable was not supported by substantial evidence and should therefore be reversed under Utah Code Ann. § 63–46b–16(4)(g). We agree.

The undisputed evidence before the Commission established that USWC paid USWRE $18.13 per square foot for the rental of USWC's headquarters building in Denver, Colorado, and that the rental rates charged by unaffiliated third parties for properties of similar quality and location ranged from $7 to $20 per square foot.[3] The Commission apparently concluded that USWC could not carry its burden of proving the reasonableness of its rental payments to USWRE to the extent that those payments exceeded the average rental rates paid for comparable properties in the same market. Although we do not find this conclusion to be in error, we think that the Commission's calculation of the average market rate was improper. Despite the lack of evidence before the Commission as to either the average market rate or the distribution of third-party rental rates within the $7–$20 range, the Commission attempted to calculate the average market rate by averaging nothing more than the high and low ends of the range. Not only is this method of calculating an average mathematically unsound,[4] but there was no evidence before the Commission from which it could have calculated the average market rate. Therefore, we conclude that the Commission's finding that USWC's rental payments to USWRE were 34% above average market rate and consequently that only 66% of those payments were reasonable was not supported by substantial evidence. Accordingly, we reverse and remand to the Commission to reconsider the reasonableness of all of USWC's rental payments to USWRE. Utah Code Ann. § 63–46b–16(4)(g).

**2.** If the Commission's only basis for discounting Dwyer's testimony is that advanced in its brief before this court, then the Commission should allow a rate increase to cover the full amount of the expenses paid to USWCS.

**3.** Dwyer testified that the range reflects differences in the amenities of the buildings, such as parking and restaurants, as well as the amount of square footage leased and the lease term.

**4.** To properly calculate the average of a range of numbers, one must divide the sum of *all* the numbers in the range by the quantity of numbers in the range. For example, the average of one, eight, and nine is six. Under the Commission's method of calculating an average, the average of one, eight, and nine would be the midpoint between one and nine, i.e., five. Therein lies the Commission's error.

USWC's third challenge is that the Commission erroneously disallowed the expense of USWC's long-term incentive compensation plan for executives, which consists of stock options and job performance shares, both of which provide additional compensation to USWC executives if U S West, Inc.'s [5] stock price increases in the long run. The Division of Public Utilities ("the Division"), a party to the proceeding before the Commission, proposed the disallowance, asserting that these costs were unreasonable in that they were tied exclusively to shareholder return and therefore provided no benefit to ratepayers. In rebuttal, USWC argued that many events which result in increased stock prices are also beneficial to ratepayers.[6] The Commission adopted the proposed disallowance, finding:

> [T]he [p]lan rewards executives on the basis of financial performance using criteria which benefit shareholders rather than ratepayers. The [p]lan focuses upon shareholder total returns. The awards are not based upon individual or team performance, productivity, customer service, or cost control. . . .

> The indirect ratepayer benefit claimed by [USWC] is little more than words.

USWC now contends that (i) the Commission applied an incorrect standard for determining whether the expense of USWC's long-term executive compensation plan was reasonable; (ii) the Commission's finding that the plan did not benefit ratepayers is not supported by substantial evidence; and (iii) the Commission's disallowance of one component of USWC's total compensation plan, which is reasonable in the aggregate, was arbitrary. We disagree.

■■■ The Commission applied the proper standard for determining whether the costs at issue were reasonable. In *Stewart v. Utah Public Service Commission*, 885 P.2d 759 (Utah 1994), we stated, "Two polar constitutional principles fix the parameters of rate regulation for natural monopolies: the protection of utility investors from confiscatory rates and, of equal importance, the protection of ratepayers from exploitive rates." *Id.* at 767 (citing *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944)). Therefore, in determining whether a particular expense is reasonable and should be charged to ratepayers in a rate increase, the Commission must consider the effects of the expense on both ratepayers and shareholders. *See Federal Power Comm'n v. Memphis Light, Gas & Water Div.*, 411 U.S. 458, 474, 93 S.Ct. 1723, 1732, 36 L.Ed.2d 426 (1973) ("[R]ates are 'just and reasonable' only if consumer interests are protected and if the financial health of the [utility] in our economic system remains strong."). This is precisely what the Commission did in the instant case. The Commission made the disallowance because it found that the long-term incentive compensation plan was designed to increase shareholder wealth only and provided no real benefit to ratepayers. Therefore, it is evident that the Commission properly considered the effects of the plan on both ratepayers and shareholders in concluding that the costs of the plan were unreasonable and should not be reflected in a rate increase.

■■■ USWC argues that even if the Commission applied the proper standard in determining that the costs of the plan were unreasonable, its conclusion that the plan provided no benefit to ratepayers is not supported by substantial evidence. The record belies this assertion. As precedent supporting its position, the Division cited a Mountain Bell rate case [7] in which the Commission disallowed a portion of management bonuses because the awards appeared to be based upon the Company's financial performance, which was in part dependent upon regulatory

---

**5.** US West, Inc., is the parent holding company of USWC and its ten affiliates.

**6.** Specifically, Mr. Dwyer testified that the following activities are in the best interests of both ratepayers and shareholders: "Providing superior value to customers through high quality goods and services. Achieving productivity gains such that costs are reduced and resources more effi-

ciently utilized. Reducing risk through consistency and predictability of revenues and earnings."

**7.** *In re Mountain States Tel. & Tel. Co.*, 71 P.U.R.4th 598, 624–25 (Utah Pub.Serv.Comm'n 1985).

climate and Commission decisions, both factors beyond management's control. Then, in direct opposition to USWC witness Dwyer's claim that many of the events which result in increased stock prices also benefit ratepayers, the Division presented the testimony of West Huntsman. In response to the question "Mr. Dwyer would have us believe that ratepayers' and shareholders' interests are interrelated and that the focus of the long term incentive program on events which are in shareholder interests are also in ratepayer interests, do you agree?" Mr. Huntsman answered:

No. The change in U S West Inc. stock price during the test period, which was the criteria for measuring the increase in shareholder value was influenced by many events which were outside of USWC executives' control. Additionally, the failure of U S WEST to make executives accountable for performance and link incentive compensation to performance appraisals makes the Company's arguments on this issue sound somewhat hollow.

On this record, we cannot agree with USWC that the Commission's finding that the plan provided no benefit to ratepayers is not supported by substantial evidence.[8]

■ USWC also maintains that because the Commission found USWC's executive compensation package reasonable as a whole, the Commission's disallowance of the long-term incentive portion of that package was arbitrary. In opposition, the Commission argues that it has discretion to assess the reasonableness of each individual component of USWC's executive compensation package. We agree with the Commission. Whenever the Commission chooses to separately evaluate each component of a compensation package, as long as it does so consistently (as opposed to, for example, evaluating one component of a compensation package separately and evaluating all other components of the package as a whole), the Commission has not acted arbitrarily. Our conclusion is supported by recent decisions from other jurisdictions, all of which disallowed the incentive portion of an employee compensation package. *See, e.g., In re GASCO, Inc.*, 132 P.U.R.4th 352, 368, 1992 WL 121735 (Haw. Pub.Util.Comm'n 1992); *In re Illinois Power Co.*, 131 P.U.R.4th 1, 62–63, 1992 WL 486361 (Ill.Commerce Comm'n 1992); *In re Union Light, Heat & Power Co.*, 134 P.U.R.4th 139, 153, 1992 WL 207202 (Ky.Pub.Serv.Comm'n 1992).

■ USWC's fourth challenge is its contention that the Commission erred in refusing to rule on USWC's proposed accounting adjustment to nonexecutive incentive compensation expenses. USWC requested that the Commission add $157,270 to the test-year expenses to account for USWC's incentive compensation plans for *both* executives *and* nonexecutives. The Commission concluded that a ruling on the proposed adjustment was unnecessary because it had already decided to disallow the entire expense of USWC's incentive compensation plan *for executives*. USWC now asserts that the Commission erred in refusing to rule on that portion of its proposed adjustment which related to *nonexecutive* incentive compensation expenses because those expenses were not disallowed and the Commission's disallowance of executive incentive compensation expenses did not render such a ruling unnecessary. We decline to consider USWC's argument because USWC failed to adequately preserve the issue for appeal.

"[A]n issue is not preserved for consideration on appeal unless it has been specifically raised in a petition for rehearing before the

---

**8.** USWC also argues that the Commission's finding was erroneous because under the Commission's formula for calculating USWC's authorized rate of return on equity, increases in U S West, Inc.'s stock price result in lower rates for service and therefore directly benefit ratepayers. However, USWC did not adequately raise this issue before the Commission. The extent of USWC's argument before the Commission that ratepayers directly benefit from higher stock prices consists of one sentence in its petition for reconsideration: "[The Commission] also ignored the fact that, under the [discounted cash flow] methodology adopted by the Commission, ratepayers directly benefit from a higher stock price through a lower cost of equity capital." Because USWC did not adequately raise this issue before the Commission, we decline to address it on appeal. *See BJ–Titan Servs. v. State Tax Comm'n*, 842 P.2d 822, 830–31 & n. 7 (Utah 1992).

[Commission]." *Utah Associated Mun. Power Sys. v. Public Serv. Comm'n,* 789 P.2d 298, 300 (Utah 1990) (citing Utah Code Ann. § 54–7–15); *cf. Williams v. Public Serv. Comm'n,* 754 P.2d 41, 48–49 (Utah 1988) ("[T]he parties' failure to request a rehearing before the [Commission] leaves this Court without subject matter jurisdiction over the petition. . . ."). In its petition for reconsideration, USWC asked the Commission to reconsider its decisions on the following issues: "1. Executive Compensation—Long–Term Incentive Plan. 2. Bodily Injury Accident. 3. Cash Working Capital. 4. Pension Asset. 5. U S West Communications Services, Inc. (CS). 6. U S West Real Estate, Inc. (REI). 7. Post Retirement Benefits Other than Pensions (PBOPs)." None of these can reasonably be interpreted to include the issue USWC now raises, i.e., whether the Commission erred in refusing to rule on USWC's proposed accounting adjustment to nonexecutive incentive compensation expenses.

USWC contends that it preserved the issue for appeal in a footnote of its petition for reconsideration, where it stated, "In the event the Commission does not reverse [its disallowance of USWC's executive incentive compensation expenses], USWC requests that the Commission reconsider the non-executive components of the accounting adjustment." However, USWC expressly limited its petition for reconsideration to the seven issues listed above. Referring directly to those seven issues, USWC stated, "USWC wishes to seek reconsideration with regard to several issues. There are other issues where [USWC] does not agree with the Commission's decision, but has chosen not to seek reconsideration." Moreover, the footnote in which USWC purports to challenge the Commission's refusal to rule on the proposed accounting adjustment lacks the argument and analysis which would have allowed the Commission to meaningfully evaluate USWC's claim. Therefore, we conclude that USWC did not adequately preserve this issue for appeal.

Fifth, USWC challenges the Commission's treatment of pension credits as negative expenses in calculating USWC's revenue requirement. In 1987, without Commission approval, USWC implemented Statement of Financial Accounting Standards No. 87 ("SFAS 87"), which changed USWC's method of accounting for pension fund assets. According to the parties, SFAS 87 requires that when pension fund earnings exceed expected liabilities, the excess be accounted for as a pension credit. Since 1987, the return on USWC's pension fund investments has given rise to pension credits totalling approximately $14,000,000. In calculating USWC's revenue requirement, the Commission treated the pension credits which accrued during the test year as negative expenses, and USWC's revenue requirement was reduced accordingly.

USWC argued before the Commission that the pension credits rightfully belong to USWC's shareholders and that because federal law requires that this money remain in the pension fund, USWC is entitled to earn its authorized rate of return on the captive funds. Consequently, USWC proposed that the Commission include the pension credits in its rate base. If adopted by the Commission, USWC's proposal would have allowed USWC to earn its authorized rate of return on the pension credits. However, the Commission rejected USWC's proposal, concluding that "the record evidence does not contain a comprehensive analysis of the problem [USWC] has identified."

USWC now asserts that the Commission erred in calculating USWC's revenue requirement by treating the pension credits as negative expenses.[9] USWC argues that the Commission rejected USWC's proposal to include the pension credits in rate base because SFAS 87, which gave rise to the credits, had not been approved by the Commission. Therefore, consistency required that the Commission also ignore the pension credits in calculating USWC's revenue requirement, and its failure to do so was arbitrary. However, our review of the record reveals that the Commission's decision to

**9.** USWC does not challenge the Commission's refusal to include the pension credits in its rate base.

exclude the pension credits from rate base was not because SFAS 87 was unapproved, but because USWC had not presented a "comprehensive analysis of the problem." In its order, the Commission made only passing mention of the fact that SFAS 87 was unapproved and explicitly stated that its "principal finding is that a comprehensive analysis of alternatives is necessary and has not been possible in the present docket." It was not inconsistent with this decision, as USWC alleges, for the Commission to include the pension credits in calculating revenue requirement. Therefore, we reject USWC's contention that the Commission acted arbitrarily in calculating revenue requirement.

■ USWC also contends that the Commission's treatment of the pension credits as negative expenses was unconstitutionally confiscatory in that it resulted in a revenue requirement which understated USWC's true test-year expenses. However, USWC did not present this argument to the Commission in its petition for reconsideration. Although USWC did request that the Commission review its decision to consider the pension credits when calculating USWC's revenue requirement, that request was based solely on USWC's assertion that doing so was inconsistent with the Commission's refusal to include the pension credits in rate base. USWC never argued before the Commission that treating the pension credits as negative expenses was confiscatory. Because USWC did not preserve this issue for appeal, we decline to consider it. *See Utah Associated Mun. Power Sys.,* 789 P.2d at 300.

Sixth, USWC challenges the Commission's treatment of the cost of post-retirement benefits other than pensions ("PBOPs"). On January 1, 1992, USWC implemented Statement of Financial Accounting Standards No. 106 ("SFAS 106"), which, according to the parties, requires that the cost of PBOPs be accounted for on an accrual basis. In other words, SFAS 106 requires USWC to account for the cost of PBOPs as employees earn them. Prior to USWC's implementation of SFAS 106, the cost of PBOPs was accounted for on a cash basis, i.e., at the time the cost was actually incurred.

In calculating USWC's revenue requirement, the Commission utilized 1991 as the test year. However, because SFAS 106 was not in effect in 1991, USWC proposed that the Commission calculate revenue requirement using the 1992 PBOPs expense. Although the Commission agreed that the change to accrual accounting for PBOPs expenses should be reflected in USWC's revenue requirement, the Commission calculated revenue requirement using an actuarial estimate of what USWC's PBOPs expense would have been in 1991 if USWC had implemented SFAS 106 on January 1, 1991 ("1991 estimate"). The Commission's use of the 1991 estimate resulted in a revenue requirement which was substantially lower than it would have been if the Commission had used the 1992 actual PBOPs expense instead. USWC now asserts that the Commission erred in using the 1991 estimate.

■ USWC first contends that the Commission's use of the 1991 estimate was confiscatory because the Commission failed to adjust that test-year figure to reflect the post-test-year impact of SFAS 106. In support of its contention, USWC relies on a number of cases suggesting that in calculating a utility's revenue requirement, a rate-making body must take into account known and measurable conditions not existing during the test year but which will necessarily affect the utility's post-test-year expenses. *See, e.g., Mountain States Tel. & Tel. Co. v. Public Utils. Comm'n,* 182 Colo. 269, 513 P.2d 721, 724 (1973) (en banc); *Southern New England Tel. Co. v. Public Utils. Comm'n,* 29 Conn. Supp. 253, 282 A.2d 915, 918–19 (1970); *Utah Power & Light Co. v. Idaho Pub. Utils. Comm'n,* 102 Idaho 282, 284, 629 P.2d 678, 680 (1981). Despite USWC's contention to the contrary, the Commission did take these conditions into account in calculating USWC's revenue requirement. By using an estimate of what USWC's PBOPs expense would have been in 1991 had USWC implemented SFAS 106 on January 1, 1991, the Commission properly took into account the post-test-year change to SFAS 106 accounting. Therefore, the Commission's use of the 1991 estimate in calculating revenue requirement was not confiscatory.

██ USWC also argues that the Commission's use of the 1991 estimate in calculating revenue requirement violated USWC's due process rights because USWC was not notified that the Commission intended to use the 1991 estimate and was therefore denied a reasonable opportunity to respond. However, because USWC has not shown that it was substantially prejudiced by its asserted lack of notice, we need not reach the merits of USWC's argument.

> [F]or a reviewing court to grant relief under the [Utah Administrative Procedures Act], it must determine that the party has been "substantially prejudiced" by the complained-of agency action. Utah Code Ann. § 63–46b–16(4). In other words, we must be able to determine that the alleged error was not harmless. Thus, the aggrieved party must be able to demonstrate how the agency's action has prejudiced it.

*Mountain Fuel Supply Co. v. Public Serv. Comm'n,* 861 P.2d 414, 423 (Utah 1993) (citation omitted). USWC has failed to do so in this case. Nothing in the record before us indicates that the Commission might have decided not to use the 1991 estimate if USWC had been given notice and an opportunity to respond. In its brief, USWC simply asserts that it "never had an opportunity to present evidence that the 1991 estimate of PBOP expenses was not appropriate" but does not explain what that evidence would have been or how it might have influenced the Commission's decision. In the absence of such an explanation, we cannot conclude that USWC was substantially prejudiced by the Commission's alleged failure to provide notice and an opportunity to respond.

██ Next, USWC argues that the Commission's decision to use the 1991 estimate is not supported by substantial evidence in the record or by sufficient subsidiary findings to demonstrate a logical and legal basis for the decision. Again, we disagree. In denying USWC's petition for reconsideration, the Commission explained that its use of the 1991 estimate was consistent with its use of a 1991 test year:

> The purpose of using the 1991 information on PBOP costs was to match the

expense with the 1991 test-year data. In its petition for reconsideration USWC claimed that the 1992 PBOP costs were $2.174 million higher than the expected 1991 costs which would result in a disallowance of that amount. However, all revenues, expenses and investments changed from 1991 levels. Therefore, before USWC's claim of a $2.174 million disallowance can be evaluated, all 1992 revenues, expenses and investments would have to be examined in a *matched* 1992 test year. The effect of using a 1991 test year precluded the use of the 1992 information.

Because USWC does not appeal the Commission's use of a 1991 test year, we cannot conclude that the Commission's decision to use the 1991 estimate was not supported by substantial evidence and sufficient subsidiary findings.

██ USWC also challenges the Commission's treatment of the 1991 PBOPs expense of its affiliate U S West Direct ("USWD"). In accordance with its historical practice, the Commission imputed USWD's test-year profits to USWC in calculating USWC's revenue requirement. However, the Commission rejected USWC's request to reduce USWD's test-year profits to reflect the post-test-year impact of SFAS 106 on USWD's PBOPs expenses.[10] USWC now asserts that the Commission's refusal to take into account the impact of SFAS 106 on USWD's future PBOPs expenses constitutes reversible error. We disagree.

As we discussed above, the Utah Administrative Procedures Act precludes our reversal of an agency action unless the complaining party has been substantially prejudiced by that action. Utah Code Ann. § 63–46b–16(4). Despite USWC's suggestion that its revenue requirement would have been higher if the Commission had adjusted USWD's test-year profits to take into account the future effect of SFAS 106, we can find nothing in either the record or the parties' briefs which supports this assertion. In light of the Commission's refusal to consider post-test-year PBOPs expenses in calculating revenue requirement, USWC was obligated to proffer an estimate of what USWD's test-year PBOPs expense would have been had USWD

---

10. USWD implemented SFAS 106 in 1993.

implemented SFAS 106 in 1991. Neither the record nor USWC's briefs contain such a proffer. In the absence of such information, we cannot conclude that USWC has been substantially prejudiced.

 Finally, USWC challenges the Commission's adoption of a five-year phase-in of SFAS 106 expenses and its requirement that USWC establish an external fund for PBOPs expenses. The Commission ordered that SFAS 106 expenses be gradually phased in to USWC's rates over a five-year period. Specifically, the Commission ordered that SFAS 106 expenses be reflected in rates according to the following schedule: 50% the first year; 65% the second year; 80% the third year; 90% the fourth year; and 100% the fifth year. The Commission also ordered USWC to deposit funds in an external account dedicated solely to PBOPs expenses. USWC now contends that these decisions are confiscatory.

However, because USWC did not raise this argument in its petition for reconsideration, the issue has not been properly preserved for appeal. *Utah Associated Mun. Power Sys.*, 789 P.2d at 300. Although USWC did challenge the Commission's phase-in and funding requirements in its petition for reconsideration, it did not do so on the ground that these requirements were confiscatory. Because USWC did not preserve this issue for appeal, we decline to consider it. *Id.*

In sum, we reverse the Commission's disallowance of 10% of USWC's expenses for marketing services rendered by USWCS and 34% of USWC's rental payments to USWRE and remand for the Commission's reconsideration of the reasonableness of those expenses. As to all remaining aspects of USWC's appeal, we affirm.

HOWE, DURHAM and RUSSON, JJ., and STANTON M. TAYLOR, District Judge, concur.

I. DANIEL STEWART, Associate Chief Justice, having disqualified himself, does not participate herein; STANTON M. TAYLOR, District Judge, sat.